FILED
2009 Jun-29  AM 09:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **SHEILA D. BOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  1:07-CV-1973-VEH** |
| | ) | |
| **HONDA MANUFACTURING OF** | ) | |
| **ALABAMA, LLC,** | ) | |
| | ) | |
| **Defendant.** | | |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Sheila D. Boyd ("Boyd") initiated this job discrimination and retaliation case on October 26, 2007, against Defendant Honda Manufacturing of Alabama, LLC ("HMA").  (Doc. 1).  Boyd filed an amended complaint on April 28, 2008.  (Doc. 12).

Boyd's amended complaint contains five counts.  Count One is a race discrimination (failure-to-promote) and retaliation claim asserted pursuant to 42 U.S.C. § 1981.  Count Two is a Title VII gender discrimination claim.  Count Three is a discrimination claim alleged under the Americans with Disabilities Act ("ADA").  Count Four is for retaliation under § 1981, Title VII, and the ADA.  Count Five is a

Title VII hostile work environment claim.

This case was reassigned to the undersigned on August 7, 2008. (Doc. 15). On February 12, 2009, counsel for Boyd withdrew from further representation of her (Doc. 30) and, since that time, Boyd has proceeded in this case as a *pro se* litigant. The order conditionally granting the attorney withdrawal request gave Boyd express notice and an explanation of Rule 56 of the Federal Rules of Civil Procedure consistent with the requirements set forth in *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). (Doc. 30 at 2-3; *id.* at attached notice).

The order also advised Boyd of her obligation to comply with Appendix II of the court's Uniform Initial Order when filing her response to summary judgment. (Doc. 30 at 2 ("Ms. Boyd is hereby **NOTIFIED** that the Court's Uniform Initial Order, at Appendix II, contains requirements that she (or any counsel who appears for her) must follow in responding to Defendant's pending Motion for Summary Judgment.)).

Pending before the court are three motions: (1) HMA's Motion for Summary Judgment (Doc. 26) filed on February 10, 2009; (2) HMA's Motion to Strike Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. 39) ("Motion to Strike Opposition") filed on April 13, 2009; and (3) HMA's Motion to Strike Plaintiff's Response to Defendant's Evidentiary Material (Doc. 40) ("Motion

to Strike Response") filed on April 13, 2009.

Boyd responded to HMA's Motion for Summary Judgment on March 31, 2009 (Doc. 36) and on April 1, 2009. (Doc. 37). HMA filed its reply (Doc. 38) on April 13, 2009, in addition to its Motion to Strike Opposition (relating to Boyd's Doc. 36) and Motion to Strike Response (relating to Boyd's Doc. 37). Boyd did not respond to HMA's Motion to Strike Opposition or Motion to Strike Response.

For the reasons explained below, HMA's Motion for Summary Judgment is due to be granted, its Motion to Strike Opposition is due to be granted in part and denied in part,[1] and its Motion to Strike Response is similarly due to be granted in part and

---

[1] HMA's Motion to Strike Opposition seeks to have Boyd's entire opposition (Doc. 37) stricken because she has failed to comply with the requirements of Appendix II of the court's Uniform Initial Order. (Doc. 6 at Appx. II). That portion of the motion is due to be denied.

The second part of the motion seeks to partially strike Boyd's opposition because it contains inadmissible evidence, *i.e.,* on the basis of irrelevancy and/or immateriality, and that relatedly those objectionable portions are incompatible with the requirements of Rule 56. *See, e.g.*, Fed. R. Civ. P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge, <u>set out facts that would be admissible in evidence</u>, and show that the affiant is competent to testify on the matters stated.") (emphasis added); Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--<u>set out specific facts showing a genuine issue for trial</u>.") (emphasis added); *see also* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); Fed. R. Evid. 402 ("Evidence which is not

denied in part.[2]

_____

relevant is not admissible.").   The motion is due to be granted as to each so-challenged area of Boyd's opposition because the information has nothing to do with the merits of Boyd's claims or HMA's defenses (*i.e.*, (1)  Parker's resignation and Henson's receiving disparate treatment; (2) the unlawfulness of HMA's former uniform policy; and (3) documents from the Occupational Safety and Health Administration relating to prior citations that HMA received).

    [2]  HMA's Motion to Strike Response seeks to strike various portions of the multiple affidavits offered by Boyd in opposition to summary judgment.  The subject affidavits are Boyd's sworn responses to (1) the affidavit of Robert Wheeler ("Wheeler") affidavit; (2) the affidavit of Peggy Anderson ("Anderson"); (3) the affidavit of Eddie Smith ("Smith"); (4) the affidavit of Freddie Thomas ("Thomas"); and (5) the affidavit of Robb Harris ("Harris").  The grounds relied upon by HMA include that the objectionable areas are "inadmissible under the Federal Rules of Evidence; contain conclusory allegations, speculation, and conjecture; or are irrelevant or immaterial."  (Doc. 40 at 1).  HMA also relies upon the so-called *Van T. Junkins* rule to support its motion, in which the Eleventh Circuit held that a "party cannot . . . create . . . an issue [of fact] with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  HMA's Motion to Strike Response is well-taken and it is due to be granted nearly in its entirety.  Accordingly, the following list sets forth the areas of record (relating to the opposing affidavit testimony offered by Boyd) to be stricken on the grounds cited by HMA:  Doc. 36 at 2 ¶ 7 (non-conformance to HMA policy); *id.* at 3 ¶ 10 (ulcerative colitis does substantially limit major life activities); *id.* at 1 ¶ 4 (several associates' taking in notebooks during interview process); *id.* at 1 ¶ 5 (conspiracy to manipulate the interview scores); *id.* at 2 ¶ 8 (lack of ISO knowledge on the parts of Williams, Anderson, Wheeler, and Parker); *id.* at 3 ¶ 9 (Carolyn Shisler as more qualified to conduct the interview process); *id.* at 3 ¶ 10 (Wheeler's affidavit made in bad faith); *id.* at 3 ¶ 11 (Wheeler's willingness to commit perjury to avoid retaliation and/or to receive a "victory basket");  *id.* at 1 ¶ 9 (Boyd's interview score and comments received during her initial hiring); *id.* at 3 ¶ 11 (HMA's counsel's sending "victory baskets" to witnesses in an unrelated case);  *id.* at 86 ¶ 3 (Anderson's making derogatory comments about Boyd's medical condition); *id.* at 87 ¶ 8 (non-conformance to HMA policy); *id.* at 87 ¶ 5 (several associates' taking in notebooks

4

during interview process); *id.* at 88 ¶ 9 (Carolyn Shisler as more qualified to conduct the interview process); *id.* at 88 ¶ 10 (Anderson's affidavit made in bad faith); *id.* at 88 ¶ 11 (Anderson's willingness to commit perjury to avoid retaliation and/or to receive a "victory basket"); *id.* at 88 ¶ 9 (Boyd's interview score and comments received during her initial hiring); *id.* at 88 ¶ 11 (HMA's counsel's sending "victory baskets" to witnesses in an unrelated case); *id.* at 93 ¶ 12 (ulcerative colitis does substantially limit major life activities); *id.* at 94 ¶ 13 (Smith's willingness to commit perjury to avoid retaliation and/or to receive a "victory basket"); *id.* at 92 ¶ 7 (Boyd's placement into a different area); *id.* at 94 ¶ 13 (HMA's counsel's sending "victory baskets" to witnesses in an unrelated case); *id.* at 105 ¶ 4 (Boyd's objection to being sent home for taking multiple medications); *id.* at 105 ¶ 6 (same); *id.* at 106 ¶ 7 (HMA's practice regarding associates' taking prescription medications); *id.* at 106 ¶ 4 (Thomas's affidavit made in bad faith); *id.* at 106 ¶ 9 (Thomas's willingness to commit perjury); *id.* at 110 ¶ 5 (Boyd's belief that "corrective action" should be taken against members of Associate Relations "for their inability to maintain accurate attendance records and documentation"); *id.* at 111 ¶ 9 (Boyd's belief that "an African American is normally appointed as the 'escape goat' to address [racial] concern[s]" and "to make light of the situation"); *id.* at 111 ¶ 12 (Boyd's contention that Harris tried "to cover up [her] concern[s]"); *id.* at 111 ¶ 14 (Harris's willingness to commit perjury); *id.* at 111 ¶ 8 (Boyd's discussion of the "Black History poem screen saver" incident); *id.* at 111 ¶ 10 (same); and *id.* at 111 ¶ 11(same).

As for Boyd's affidavit testimony about various witnesses' knowledge of her medical conditions, that portion of the motion is due to be denied. While the court acknowledges that mere knowledge of a medical condition, without more, is likely insufficient to establish a *prima facie* case of disability discrimination under the ADA, any evidence about the scope of an employer's knowledge is still relevant to the merits of Boyd's ADA claims and HMA's defenses. Accordingly, the court rejects HMA's efforts to strike the following portions of the record and instead evaluates their impact on summary judgment later within the opinion: Doc. 36 at 1 ¶ 3 (Wheeler's knowledge of Boyd's medical condition); *id.* at 86 ¶ 3 (Anderson's knowledge of Boyd's medical condition); *id.* at 86 ¶ 4 (Anderson's knowledge of Boyd's surgeries); and *id.* at 92 ¶ 3 (Smith's knowledge of Boyd's medical condition).

## II.   STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).[3]  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

---

[3] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

(1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## III.   STATEMENT OF FACTS[4]

### A.   HMA

HMA employs approximately 4,500 individuals at its Lincoln, Alabama plant.
AF No. 1.[5]   HMA employs Process Associates who work on the assembly line
engaged in the daily tasks of assembling Honda Odyssey and Honda Pilot vehicles;
Process Associates may also be assigned to offline positions that do not require the
associate to physically assemble or repair vehicles.  AF No. 2.  HMA also employs

---

[4]   Whenever the facts are in dispute, they are stated in the manner most
favorable to the non-moving party.  *See Fitzpatrick*, 2 F.3d at 1115.  Therefore, these
are the facts for summary judgment purposes only.  They may not be the actual facts.
*See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)
("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on
the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[5]   Boyd has not directly responded to HMA's statement of facts as required
under Appendix II of the court's Uniform Initial Order.  (Doc. 6).  As a result, by
operation of Appendix II, HMA's facts set forth in Doc. 27 are deemed admitted for
the purposes of summary judgment.  At the same time, this court is aware that any
"specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in
opposition to summary judgment.  *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th
Cir. 1986).  While Boyd's claims have not been brought pursuant to a sworn
complaint, she has offered several affidavits in opposition to summary judgment.
Accordingly, in formulating the following statement of facts, the court has considered
any specific admissible facts included in Boyd's affidavits that are material to its
decision on summary judgment.  Further, HMA seeks to strike these affidavits in
whole or in part because they are "inadmissible under the Federal Rules of Evidence;
contain conclusory allegations, speculation, and conjecture; or are irrelevant or
immaterial."  (Doc. 40 at 1).  The court has addressed the merits of these evidentiary
challenges in n.2 at 4-5, *supra*.

Associate Technical Specialists ("ATSs"), exempt associates, who are responsible for reducing and preventing quality defects.  AF No. 3.

Because associate attendance is essential to continued production, HMA maintains a no-fault attendance policy.  AF No. 4.  The attendance policy is communicated to associates through the Associate Handbook received at the time of hire and is explained to associates during orientation.  AF No. 5.  Associates receive points for attendance occurrences, without regard to whether the absence is excused or unexcused, unless the absence is covered by approved leave, including FMLA, which is processed by Aetna, a third-party administrator.  AF No. 6.

Associates may preliminarily accrue attendance points if they have a leave request not yet approved by Aetna or if they have not yet reported their time away from work to Aetna; HMA reconciles and adjusts associates' points when Aetna provides the necessary information to HMA.  AF No. 7.

**B.    HMA's Equal Employment Opportunity and Mutual Respect Policies**

At all relevant times, HMA has had in effect an Equal Employment Opportunity Policy and a Mutual Respect Policy, which strictly prohibit any form of discrimination and harassment in all terms and conditions of employment, including, but not limited to, discrimination and harassment based upon race, gender, and

disability.  AF No. 8.   HMA's Equal Employment Opportunity and Mutual Respect Policies also prohibit any form of retaliation against an associate who reports a concern about discrimination or harassment.   AF No. 9.

HMA's Equal Employment Opportunity and Mutual Respect Policies are found in HMA's Associate Handbook, distributed to associates upon hire, and explained during new hire orientation.  AF No. 10.  HMA's Equal Employment Opportunity and Mutual Respect Policies require an associate who believes he or she has witnessed or been subject to discrimination or harassment to immediately report it to his or her Team Manager, Department Manager, an Associate Relations representative, or the Department Manager of Human Resources.   AF No. 11.

### C.    HMA's Selection Process for Exempt Positions

An associate interested in applying for an available exempt position must submit an HMA Exempt Candidate Interest Form and resume to Associate Relations ("AR") by the job posting's deadline.   AF No. 12.   Applicants without active corrective action or an excessive amount of attendance points are then eligible to be evaluated by their Team Manager.  AF No. 13.   Only those candidates scoring at least a 2.0 on the Team Manager assessment proceed to the interview phase of the selection procedure.  AF No. 14.

During the interview phase, the interview team asks the same questions to each

candidate, using HMA's standardized interview guide for exempt associate positions. AF No. 15.  Immediately following the interview, the interview team assigns each candidate an interview score by comparing notes and agreeing on the score each candidate should receive for each area of questioning.  AF No. 16.  The candidates' interview scores are averaged with their respective Team Manager assessment score, and the candidate with the highest score generally receives the available position.  AF No. 17.

### D.   Boyd's Employment with HMA

Boyd applied for employment with HMA on March 17, 2001.  AF No. 18. Boyd began working for HMA as a Process Associate on April 30, 2001, and received a copy of the Associate Handbook upon her hire.  AF No. 19.  Boyd began working in an online position in the Paint Department, where she physically polished, painted, and prepped vehicles.  AF No. 20.

In 2003, plaintiff applied and was selected for an offline Line Quality Process Associate position, where she monitored and gathered quality information for the Paint Department.  AF No. 21.  In 2007, plaintiff requested a transfer to an online position.  AF No. 22.

HMA made plaintiff aware of the online position available to her before she accepted the transfer.  AF No. 23.  Boyd worked with Team Managers Larry Henson

("Henson") and Tammy Steelman ("Steelman") and Paint, Line 1 Department Manager Eddie Smith ("Smith").  AF No. 24.

### E.    Boyd's Application for the ATS Position in 2006

On July 21, 2006, the Line 1 Paint Department posted a job opening for a Quality Group ATS position, in which the associate is responsible for studying ongoing quality defect problems, generating reports that effectively communicate countermeasures to prevent future defects, and ensuring departmental compliance with ISO requirements.  AF No. 25.  The job posting explained that relevant experience and good communication skills were required, and that, upon starting, the candidate selected for the position must complete ISO auditor training.  AF No. 26.

Sixteen associates applied for the ATS position, and thirteen associates, including plaintiff, were eligible to proceed to the Team Manager assessment phase. AF No. 27.  Boyd received a score of 2.13 on her assessment, and she and seven other associates interviewed for the position.  AF No. 28.

The interview team consisted of Anderson, Gary Parker ("Parker"), and Wheeler, all of whom had been trained in HMA's Selection Interview Workshop.  AF No. 29.  Boyd and the seven other candidates were asked the same questions measuring their work experience and people, leadership, and communication skills. AF No. 30.

12

The interview team noticed that, when asked a question, Boyd would refer to a notebook she brought to the interview and she was instructed to answer questions without relying upon the notebook.  AF No. 31.  At the conclusion of Boyd's interview, the interview team compared notes and gave her an interview score of 1.73.  AF No. 32.

Boyd's combined score was 1.93.  AF No. 33.  On October 10, 2006, HMA notified Boyd that she did not receive the ATS position because she did not receive the highest combined score.  AF No. 34.

### F.   Boyd's Ulcerative Colitis and Bursitis

Boyd was diagnosed with ulcerative colitis in 1993.  AF No. 35.  Boyd's ulcerative colitis causes six to seven bowel movements per day, fatigue, and nausea, exacerbated by heat.  AF No. 36.

Boyd cannot eat certain types of food and is awakened from sleep about three times per night to have a bowel movement.  AF No. 37.  Boyd has had surgeries to correct problems caused by her ulcerative colitis.  AF No. 38.

Boyd was diagnosed with bursitis in 2004.  AF No. 39.  Boyd's bursitis causes inflammation of her right hip, left hip, right knee, left knee, and right shoulder.  AF No. 40.

Since 2007, Boyd has used a cane about twice a month to assist her in walking

during a flare up of her bursitis.  AF No. 41.  Boyd's bursitis sometimes prohibits her from having an uninterrupted sleep.  AF No. 42.

### G.    Boyd's Alleged Disability

Boyd contends that ulcerative colitis and bursitis render her disabled.  AF No. 43.  Boyd is able to work her full shift at HMA and perform all of the essential functions of her job.  AF No. 44.

Boyd is under no work restrictions for her ulcerative colitis or bursitis.  AF No. 45.  Boyd is not prevented from doing anything in life because of her occasional fatigue and nausea.  AF No. 46.

Boyd is able to walk, perform her own bodily functions, and care for herself. AF No. 47.  Boyd is able to cut grass, do laundry, clean her house, and cook.  AF No. 48.

### H.    Boyd's   Complaint   and   Allegations   of   Disability Discrimination

Boyd's complaint alleges that HMA unlawfully denied her the ATS position based on an actual or perceived disability.  AF No. 49.  Boyd maintains that Henson and Steelman perceived her as disabled, but cannot recall anything Steelman said or did leading her to such a conclusion.   AF No. 50.

Boyd asserts that Henson commented on the way she walked and on her

attendance.  AF No. 51.  Neither Henson nor Steelman were ever made aware that Boyd had any medical condition that potentially substantially limited a major life activity.  AF No. 52.

Henson provided plaintiff with a 2.13 Team Manager assessment score, allowing her to interview for the ATS position, but Steelman had no role in the selection process.  AF No. 53.  No associate on the interview team was aware of any medical condition that caused Boyd to be disabled, although Boyd has sworn by affidavit that two of the members, Wheeler and Anderson, were aware of her medical condition.  AF No. 54; (Doc. 36 at 1¶ 2; Doc. 36 at 86 ¶ 2).  At no time has HMA received any information that Boyd's ulcerative colitis and/or bursitis rendered her disabled.  AF No. 55.

Boyd's complaint also alleges that HMA retaliated against her by denying her request for a reasonable accommodation.  AF No. 56.  HMA provides reasonable accommodations to associates with physical or mental impairments substantially limiting a major life activity so that they may perform the essential functions of their positions.  AF No. 57.

Boyd asserts that she requested and did not receive a base station radio for her work area that would make it easier for her and other associates to contact their Team Coordinator ("TC") when they need to use the bathroom, but concedes that she is

currently able to contact her TC and that she has never been prohibited from using the bathroom.  AF No. 58.

## I. Boyd's Complaint and Allegations of Race and Sex Discrimination

Boyd's complaint also maintains that HMA unlawfully denied her the ATS position based on her race and sex.  AF No. 59.  Boyd contends that she was more qualified for the position than Leland Williams ("Williams"), the candidate that HMA ultimately selected.  AF No. 60.

Williams received a 2.99 Team Manager Assessment score and a 2.43 interview score, resulting in a combined average score of 2.34, the highest of any associate seeking the ATS position.  AF No. 61.  Williams received a higher Team Manager Assessment score due to his technical, business, and interpersonal skills, and a higher interview score because of his ability to communicate his job knowledge and his leadership and people skills.  AF No. 62.

Boyd alleges that Henson told her that she was the only one qualified, but does not know if Henson participated in the interview process.  AF No. 63.  Boyd also maintains that she was more qualified than Williams because she had more seniority, but concedes that she does not know what role seniority played in HMA's decision, and that no one at HMA ever indicated that the person with the most seniority would

get the job.  AF No. 64.

Boyd contends that she was more qualified than Williams because he did not have auditor training, but admits that the job posting did not state that auditor training was a prerequisite and that she does not know whether Williams successfully completed the training after he was given the position.  AF No. 65.  Boyd also contends that she was more qualified than Williams because he could not make charts and graphs on the computer and he was not proficient in PowerPoint, but admits that the job posting does not say anything about charts or graphs and that she does not know what weight HMA gave to the candidates' ability to use PowerPoint.  AF No. 66.

Boyd admits that she has no knowledge of what took place in Williams's interview, does not know anything about his educational background, and does not know what positions he held in his prior employment.  AF No. 67.  Boyd's race, sex, and alleged disability played no role in HMA's decision to not place her in the ATS position.  AF No. 68.

Boyd is aware that both African Americans and women fill other ATS jobs at HMA and concedes that HMA should select the most qualified candidate for a position.  AF No. 69.

### J.     Boyd's Complaint and Allegations of Retaliation

Boyd's complaint also alleges that HMA retaliated against her for filing her February 24, 2007 EEOC Charge.  AF No. 70.  Boyd contends that HMA retaliated against her by issuing her undeserved attendance points, but admits that leave requests required Aetna approval, that any errors have been corrected, and that she has never suffered any adverse job action as a result.  AF No. 71.  Boyd also contends that Steelman switched her schedule to accommodate other associates, but she is aware of no facts that suggest the schedule changes were motivated by retaliation. AF No. 72.

Boyd further asserts that Steelman harassed her by calling her at home while she was on FMLA leave, but admits that it was Steelman's job to ensure manpower coverage for shifts.  AF No. 73.  Boyd also alleges that HMA denied her request for manpower lists, which are available to associates on the bulletin boards and are constantly changing, but concedes that she accepted a transfer to an available online position before she even made the request.  AF No. 74.

### K.     Boyd's Complaint and Allegations of Hostile Work Environment

Boyd's complaint finally alleges that she was unlawfully harassed based on her gender and alleged disability.  AF No. 75.  Boyd contends that Steelman's conduct,

specifically, changing her work schedules, calling her at home, and making comments about her leave, caused her to develop depression.  AF No. 76.

In 2007, Boyd reported her concerns about Steelman to Smith, and HMA promptly investigated her concerns.  AF No. 77.  Jean Batemon ("Batemon"), an AR representative, conducted the investigation and concluded that Steelman had followed HMA's general business practices and that Boyd's concerns were unsubstantiated. AF No. 78.

HMA further concluded that Steelman's comments about associates taking leave could be perceived as inappropriate, and counseled her about her behavior.  AF No. 79.  Boyd no longer reports to Steelman and has raised no other concerns about harassment.  AF No. 80.  Since her transfer, Boyd states that she no longer suffers from depression and does not need any counseling.  AF No. 81.

## IV.   ANALYSIS

### A.    Boyd's Response to HMA's Motion for Summary Judgment Fails to Procedurally Comply with the Court's Requirements.

If the nonmovant has not supplied the court with a response to dispute any issue of fact, this court may receive the movant's factual account as "a *prima facie* showing of its entitlement to judgment."  *Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988) (citing *Matsushita Electrical Industrial Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 1356 (1986); *Anderson*, 477 U.S. 242, 106 S. Ct. at 2511; *Celotex*, 477 U.S. 317, 106 S. Ct. at 2553).  Here, while Boyd has offered filings in response to HMA's Motion for Summary Judgment, neither one directly addresses HMA's statement of facts.

This omission also fails to comply with the court's summary judgment requirements.  In particular as Appendix II to the Uniform Initial Order provides in pertinent part:

### D.    Manner of Stating Facts

All briefs submitted either in support of or opposition to a motion must begin with a statement of allegedly undisputed relevant material facts set out in *separately numbered paragraphs*.  Counsel must state facts in clear, unambiguous, simple, declarative sentences.  All statements of fact must be supported by specific reference to evidentiary submissions. . . .

### 2.    Opposing Party's Statement of Facts

Each party opposing a summary judgment motion also must submit a statement of facts divided as follows.

### a.    Response to Movant's Statement

The first section must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts.  The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts.  Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon

which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment*.

(Doc. 6 at Appx. II at 15, 16-17 (emphasis by underlining added)).

As stated previously in the record, although the court recognizes that Boyd is no longer represented by counsel in this case, she still must obey all orders of the court. Litigants, regardless of their representation status, cannot pick and choose which orders they will follow. Accordingly Boyd's failure to adequately oppose HMA's statement of facts consistent with the requirements of Appendix II means that Boyd has admitted HMA's entire statement of summary judgment facts, and HMA has made "a *prima facie* showing of its entitlement to judgment."

**B.     Substantively, HMA's Motion for Summary Judgment is well-taken and due to be granted.**

HMA has moved for summary judgment on every claim asserted by Boyd. The court addresses each one in turn.

**1.     Section 1981 Race Discrimination**

"In a traditional failure-to-hire case, the plaintiff establishes a *prima facie* case by demonstrating that: (1) she was a member of a protected class; (2) she applied and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) the position remained open or

was filled by another person outside of her protected class." *See, e.g., E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002) (citation omitted); *Sledge v. Goodyear Dunlop Tires North America, Ltd.*, 275 F.3d 1014, 1015 n.1 (11th Cir. 2001) (setting forth *prima facie* elements of failure-to-hire claim). Here, Boyd objects to the placement of Williams in the ATS position over her.

Assuming without deciding that Boyd has met her *prima facie* burden,[6] HMA contends that it is still entitled to summary judgment because Boyd has failed to create a material factual dispute as to its explanation for its decision not to select her, *i.e.*, because "she was not the highest-scoring candidate[.]" (Doc. 38 at 5-6). The court agrees with HMA that Boyd's race discrimination claim fails due to her inability to show pretext.

In addressing the issue of pretext, the Supreme Court has stated:

Thus, a plaintiff's *prima facie* case, combined with sufficient evidence

---

[6] Despite her completion of the screening and interviewing processes, HMA superficially argues in its opening brief that Boyd is unable to establish a *prima facie* case because "she was not qualified for the ATS position." (Doc. 27 at 23 (citation omitted)). More specifically, HMA contends that Boyd failed "to demonstrate relevant experience, as well as effective communication skills[.]" (*Id.*). HMA then quickly proceeds to address its primary contention: "Even assuming, *arguendo*, that plaintiff could establish a *prima facie* case, she cannot prove that HMA's legitimate, non-discriminatory reason for not placing her in the ATS position -- the fact that she was not the highest-scoring candidate -- is a pretext for race or sex discrimination." (*Id.* (citation omitted)). HMA does not reassert this *prima facie* position in its reply brief and focuses instead exclusively upon the area of pretext.

to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability.  Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148 (citations omitted).  Therefore, despite a plaintiff's best efforts to demonstrate an issue of fact regarding the truthfulness of an employer's asserted justification for an adverse employment decision, judgment as a matter of law in favor of the employer would still be appropriate if the record:  1) conclusively demonstrates some other, non-discriminatory basis for the decision; or 2) reveals only a weak issue of fact coupled with plentiful evidence that no illegal discrimination took place.

Moreover, here Boyd has not created <u>any issue of fact</u> regarding the truthfulness of HMA's asserted justification for selecting Williams over her for the ATF position, *i.e.*, Boyd's lower overall score.  For example, there is no evidence that HMA has given a "shifting explanation for its actions."  *See, e.g., Bechtel Const. Co.*

*v. Secretary of Labor*, 50 F.3d 926, 935 (11th Cir. 1995).

In lieu of showing pretext, Boyd questions the propriety of HMA's decision to deselect her for the open ATS slot. However, in doing so, Boyd misses the mark because the crucial examination at the pretext level is whether the employer has honestly explained its actions, not whether the employer is "right" or made the "best" decision under the circumstances:

> Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA [or § 1981] does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted). "[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory. . . ." *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982) (emphasis in original). *See also Jones*, 874 F.2d at 1540; *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir.1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

Boyd also complains that HMA did not follow its own policy when it promoted Williams. *See, e.g., Morrison v. Booth*, 763 F.2d 1366, 1374 11th Cir. 1985) ("Departures from normal procedures may be suggestive of discrimination.") (citation

24

omitted).  However, the underlying evidence does not support the existence of any

such purported procedural inconsistencies occurring during the promotional process.

Instead, the undisputed record substantiates that HMA followed its normal procedures

and that Boyd was not the highest-scoring candidate upon completion of the process.

Accordingly, HMA is entitled to summary judgment on Boyd's race discrimination

claim as set forth in Count One because she cannot show pretext.[7]

### 2.    Title VII Gender Discrimination

Boyd's Title VII gender discrimination claim fails for the same reasons that her

§ 1981 race discrimination claim does—Boyd lacks sufficient evidence of pretext.

Accordingly, HMA is similarly entitled to summary judgment on Count Two of

Boyd's complaint.

### 3.    ADA Claims

Based upon her opposition to summary judgment, Boyd seems to assert not

only a failure-to-promote claim under the ADA, but also one for the failure to

accommodate her.  The court addresses Boyd's failure-to-promote claim first.

---

[7] The court notes that Count One of Boyd's complaint also includes a claim for
retaliation under § 1981.  However, Boyd duplicates that same retaliation claim as
part of Count Four, and the court addresses it later in the opinion as part of that
particular count.

### a.    Discriminatory Failure to Promote

"In order to establish a *prima facie* case of discrimination under the ADA, [a plaintiff] must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citation omitted).  This standard derives from the ADA's language, stating that "no [employer] shall discriminate against a qualified individual with a disability because of the disability of such an individual." 42 U.S.C. § 12112(a). . . .

For the first element of an ADA claim, a plaintiff qualifies as disabled under the ADA if he has "(A) a physical or mental impairment that substantially limits one or more of the major life activities . . .; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(2).

*Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263-64 (11th Cir. 2007).

HMA challenges Boyd's ability to establish a *prima facie* case of disability discrimination.  However in its initial brief, HMA limits its discussion to pre-ADA Amendments Act of 2008 ("ADAAA") case law.[8]   Further, HMA takes the position

---

[8]  The ADAAA provides in part that:

**(A)** The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

**(B)** The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

**(C)** An impairment that substantially limits one major life activity need

not limit other major life activities in order to be considered a disability.

**(D)** An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

**(E)(i)** The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as--

> **(I)** medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

> **(II)** use of assistive technology;

> **(III)** reasonable accommodations or auxiliary aids or services; or

> **(IV)** learned behavioral or adaptive neurological modifications.

42 U.S.C. § 12102(4)(A)-(E)(i). Relatedly, the last stated purpose of the ADAAA calls for a broadening of the term "substantially limits":

> **(6)** to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term 'substantially limits' as 'significantly restricted' to be consistent with this Act, including the amendments made by this Act [ADA Amendments Act of 2008, Pub. L. 110-325, Sept. 25, 2008, 122 Stat. 3553, enacting 42 U.S.C.A. §§ 12103 and 12205a, amending this section, and 29 U.S.C.A. § 705, 42 U.S.C.A. §§ 12102, 12111 to 12114, 12201, and 12210, redesignating 42 U.S.C.A. §§ 12206 to 12213, and enacting provisions set out as notes under this

in its reply that the ADAAA does not apply in this case and that Boyd is incorrect in maintaining "without any factual support, that ulcerative colitis and burisitis/arthritis are episodic impairments qualifying as disabilities under the [ADAAA]."  (Doc. 38 at 3).

HMA cites only to the ADAAA's effective date, *i.e.*, January 1, 2009, as support for this particular proposition.  (Doc. 38 at 3 n.6).  Based upon this court's independent research, it appears that the issue of any retroactive application relating to the ADAAA is still an open question within the Eleventh Circuit.  As the unpublished per curiam Eleventh Circuit decision of *Shannon v. Potter*, No. 08-16827, 2009 WL 1598442 (11th Cir. June 9, 2009), notes:

> The ADAAA changes the definition of major life activities to include lifting.  This amendment became effective January 1, 2009, after the district court issued its order granting summary judgment in the instant case.   This court has not yet issued a published opinion addressing the potential retroactive effect of the ADAAA, and need not do so here because Shannon has not established that he is a "qualified individual."

2009 WL 1598442, at *2 n.5 (emphasis added).

Prior to the issuance of *Shannon*, in another unpublished per curiam decision, the Eleventh Circuit indicated that the ADAAA should not apply retroactively:

---

section and 29 U.S.C.A. § 705].

Pub. L. 110-325, § 2, Sept. 25, 2008, 122 Stat. 3553.

Congress recently enacted major changes to the ADA. By adoption of the Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), effective 1 January 2009, Congress has expressly instructed courts that "[t]he definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals." Pub. L. No. 110-325, § 4(a).  Plaintiff makes no argument that the amendments should apply retroactively; and <u>absent Congressional expression to the contrary, a presumption against retroactive application applies when the new legislation would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed</u>." *Landgraf v. USI Film Products*, 114 S. Ct. 1483, 1505 (1994).  So, we look to the ADA as it was in effect at the time of the alleged discrimination.

*Fikes v. Wal-Mart, Inc.*, No. 08-12773, 2009 WL 961774, at *1 n.1 (11th Cir. 2009) (emphasis added).  However, because *Fikes* is unpublished, it is not binding on the Eleventh Circuit or this court, is comparable to decisions issued by other circuit courts, and therefore, at best, is only persuasive authority.  *See, e.g., Baker v. Birmingham Board of Education*, 531 F.3d 1336, 1338 (11th Cir. 2008) ("[B]ecause *Palmer* is an unpublished decision, it is not binding precedent.") (citing *Twin City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co., Inc.*, 480 F.3d 1254, 1260 n.3 (11th Cir. 2007); 11th Cir. Rule 36-2).

However, the Fifth Circuit has determined in a published decision that the "changes" contained in the ADAAA "do not apply retroactively." *E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462, 469 n.8  (5th  Cir. 2009) ("'Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it

views as a better rule established in earlier decisions, its intent to reach conduct preceding the 'corrective' amendment must clearly appear.'") (citing *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 (1994)); *see also Kiesewetter v. Caterpillar, Inc.*, No. 08-2140, 2008 WL 4523595, at *1 (7th Cir. Oct. 9, 2008) ("We use the laws and interpretations that were in force when the complained-of acts occurred.") (citing *Landgraf v. USI Film Products*, 511 U.S. 244 (1994)).

In contrast, the Ninth Circuit, while not deciding the retroactivity issue, still used the ADAAA in its analysis in a reversal of summary judgment in favor of the employer in *Rohr v. Salt River Project Agricultural Imp. & Power District*, 555 F.3d 850, 853 (9th Cir. 2009) ("We therefore need not decide whether the ADAAA, which took effect on January 1, 2009, applies retroactively to Rohr's claims."); *Rohr*, 555 F.3d at 861 ("Nevertheless, because the ADAAA sheds light on Congress' original intent when it enacted the ADA, a brief discussion of the amendment is appropriate.").

Finally, in an unpublished decision, the Sixth Circuit concluded that the ADAAA applies to claims that seek prospective injunctive relief (*i.e.*, "the right to receive an accommodation on a test that will occur in the future"). *See Jenkins v. National Bd. of Medical Examiners*, No. 08-5371, 2009 WL 331638, at *1 (6th Cir. Feb. 11, 2009) ("Rather than seeking damages for some past act of discrimination by

NBME, Jenkins seeks the right to receive an accommodation on a test that will occur in the future, well after this effective date."); *Jenkins*, at *1 ("Because Jenkins seeks prospective relief, no injustice would result from applying the amended law.").

Having studied these cases and in the absence of any controlling authority from the Eleventh Circuit, this court is persuaded to follow the Fifth Circuit's reasoning in *Agro* and analyze Boyd's disability claims under the ADA rather than the ADAAA. In particular, this court is guided by the Supreme Court's discussion in *Rivers* (addressing the impact of Congress's decision to amend § 1981 in light of the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989)), upon which the *Agro* court relies, in determining that the ADAAA should not apply retroactively to Body's claims:

> "The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student," *United States v. Security Industrial Bank*, 459 U.S. 70, 79, 103 S. Ct. 407, 413, 74 L. Ed. 2d 235 (1982), and this case illustrates the second half of that principle as well as the first. Even though applicable Sixth Circuit precedents were otherwise when this dispute arose, the District Court properly applied *Patterson* to this case. *See Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97, 113 S. Ct. 2510, 2512, 125 L. Ed. 2d 74 (1993) ( "When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule"). *See also Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372, 30 S. Ct. 140, 148, 54 L. Ed. 228 (1910) ("Judicial decisions have had retrospective operation for near a

thousand years") (Holmes, J., dissenting). The essence of judicial decisionmaking-applying general rules to particular situations-necessarily involves some peril to individual expectations because it is often difficult to predict the precise application of a general rule until it has been distilled in the crucible of litigation. *See* L. Fuller, Morality of Law 56 (1964) ("No system of law-whether it be judge-made or legislatively enacted-can be so perfectly drafted as to leave no room for dispute").

*Patterson* did not overrule any prior decision of this Court; rather, it held and therefore established that the prior decisions of the Courts of Appeals which read § 1981 to cover discriminatory contract termination were incorrect. They were not wrong according to some abstract standard of interpretive validity, but by the rules that necessarily govern our hierarchical federal court system. *Cf. Brown v. Allen*, 344 U.S. 443, 540, 73 S. Ct. 397, 427, 97 L. Ed. 469 (1953) (Jackson, J., concurring in result). It is this Court's responsibility to say what a statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law. A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction. Thus, *Patterson* provides the authoritative interpretation of the phrase "make and enforce contracts" in the Civil Rights Act of 1866 before the 1991 amendment went into effect on November 21, 1991. That interpretation provides the baseline for our conclusion that the 1991 amendment would be "retroactive" if applied to cases arising before that date.

Congress, of course, has the power to amend a statute that it believes we have misconstrued. <u>It may even, within broad constitutional bounds, make such a change retroactive and thereby undo what it perceives to be the undesirable past consequences of a misinterpretation of its work product</u>. No such change, however, has the force of law unless it is implemented through legislation. Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, <u>its intent to reach conduct preceding the "corrective" amendment must clearly</u>

<u>appear</u>.  We cannot say that such an intent clearly appears with respect to § 101.  <u>For this reason, and because it creates liabilities that had no legal existence before the Act was passed, § 101 does not apply to preenactment conduct</u>.

*Rivers,* 511 U.S. at 311-13 (emphasis added) (footnote omitted).

By way of a footnote, as the Supreme Court further clarified in *Rivers*:

When Congress enacts a new statute, it has the power to decide when the statute will become effective.  <u>The new statute may govern from the date of enactment, from a specified future date, or even from an expressly announced earlier date</u>.  But when this Court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law.  <u>In statutory cases the Court has no authority to depart from the congressional command setting the effective date of a law that it has enacted</u>.  Thus, it is not accurate to say that the Court's decision in *Patterson* "changed" the law that previously prevailed in the Sixth Circuit when this case was filed.  Rather, given the structure of our judicial system, the *Patterson* opinion finally decided what § 1981 had always meant and explained why the Courts of Appeals had misinterpreted the will of the enacting Congress.

*Rivers*, 511 U.S. at 313 n.12 (emphasis added).

Comparable to the analysis surrounding Congress's 1991 amendment to § 1981 in *Rivers*, there is no provision within the ADAAA that clearly shows an intent by Congress to make it applicable to "preenactment conduct."  Therefore, this court agrees with *Agro*, and holds, based upon the principles outlined in *Rivers*, that it is appropriate to analyze the viability of Boyd's disability claims under the ADA as

opposed to the ADAAA.[9]

Moreover, the court agrees with HMA that Boyd's disability claim based upon ulcerative colitis and/or bursitis fails because she has not provided <u>any underlying admissible factual support to show her disabled status and instead has admitted contrary facts</u>. *See, e.g., Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988) ("The judge's inquiry, therefore [on summary judgment], unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of

_____

[9] The court notes that the scope of this holding does not encompass the treatment of a request for a *Jenkins*-like future accommodation under the ADA and whether the ADAAA should apply retroactively in that type of situation because, unlike the plaintiff in *Jenkins* who sought "an accommodation on a [<u>future</u>] test[,]" at *1, based upon her complaint and opposition to summary judgment, Boyd seeks redress in the form of monetary relief, including "lost wages, back pay, front pay, compensatory damages, punitive damages, costs, [and] attorney fees (*see* Doc. 12 at 10 ¶ 45), for past purported discriminatory acts on the basis of disability. As the court pointed out in *Jenkins*, a key question to ask regarding the scope of permissible retroactive application is "'whether the new provision attaches new legal consequences to events <u>completed before its enactment</u>.'" *Id.*, at *2 (emphasis added) (citation omitted). In this instance, the conduct about which Boyd complains all stems from actions that occurred prior to the ADAAA's enactment and, although she does generally state in her complaint that she is seeking declaratory and injunctive relief (*see, e.g.*, Doc. 12 at 10 ¶ 45), <u>Boyd seeks no specific prospective injunctive relief relating to HMA's future treatment of her post-enactment</u>. Alternatively, Boyd has abandoned any claim for prospective injunctive relief that may have been contained in her complaint. *See* cases on abandonment and failure to develop cited *infra* § IV.B.4 at 44-45.

proof is imposed.'") (citations omitted).

For example, as HMA points out in its reply:

> Plaintiff fails to specify a major life activity in which she is substantially limited by ulcerative colitis and/or bursitis. Instead, plaintiff concedes that she is able to walk, care for herself, cut grass, do laundry, clean her house, and cook. (Facts, ¶¶47-48). She is under no work restrictions for her ulcerative colitis or bursitis. (Facts, ¶45). Moreover, plaintiff is able to perform all of the essential functions of her manual labor job at HMA. (Facts, ¶44).

(Doc. 38 at 4 (footnote omitted)). In the absence of Boyd's specifying a major life activity in which she is substantially limited and providing evidence which substantiates those limitations, a jury cannot return a verdict for her regarding her failure-to-promote disability claim as a matter of law. *See, e.g., Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1330 (11th Cir. 2001) ("Chenoweth produced no evidence that she was, in fact, unable to perform her job."); *see also Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 598 (6th Cir. 2002) ("As we have held, '[a] single conclusory statement about an alleged substantial limitation is not enough to avoid summary judgment sought by the employer.'") (citations omitted).

Rather than establishing a record upon which a jury could return a verdict in her favor, Boyd has instead expressly disavowed the existence of any restrictions that her ulcerative colitis and/or bursitis have caused her. The mere existence of a diagnosis coupled with an admission that no restrictions have resulted from that

35

condition is insufficient as a matter of law to establish a disability discrimination claim when the plaintiff is proceeding under the ADA.

Another problem with Boyd's disability discrimination claim is the lack of any evidence substantiating that HMA had knowledge of a substantially limiting condition affecting Boyd, even assuming the existence of a disability under the ADA. As the Eleventh Circuit reasoned in *Morisky v. Broward County*, 80 F.3d 445 (11th Cir. 1996):

> Because Broward County concedes, for summary judgment purposes, that plaintiff is disabled under the Act, the issue the Court must address is narrow:  Will knowledge that an applicant for employment has a disability be imputed to a prospective employer from knowledge that the applicant has taken special education courses and cannot read or write.
>
> *Pridemore v. Rural Legal Aid Society of West Central, Ohio*, 625 F. Supp. 1180 (S.D. Ohio 1985) is instructive.  Pridemore, a lawyer admittedly suffering from "mild" effects of cerebral palsy, applied for a staff attorney position with the defendant legal services agency.  After an initial interview he submitted a seven-page letter to members of the defendant's interview committee as a supplement to the application.  In the letter he did not specifically mention his cerebral palsy disability.  In fact, he testified that a lay person would not detect the presence of the condition based on only his outward speech and demeanor.  Instead, he relied on the written document as evidence from which the agency should have been aware that he was disabled. The first statement allegedly alerting the agency provided:  "I was born, after a difficult delivery, with minuscule brain damage to the perceptual and sensory-motor areas of the brain in 1952."  The second of those statements admonished:  "Whatever your decision here today, I hope you do not turn me down in violation of the Rehabilitation Act of 1973."

Pridemore was not offered the position. He brought an action against his prospective employer alleging that he was denied employment solely on the basis of his cerebral palsy condition. On defendant's motion for summary judgment, the court concluded: "[I] cannot agree that these statements in Plaintiff's letter raise a genuine issue as to Defendant's knowledge of Plaintiff's cerebral palsy." Specifically, the court found that the second statement, which alluded to the Rehabilitation Act, was devoid of any substantive content. *Id.* at 1184.

The same logic applies here.  Morisky concedes that neither she nor Magaz, her vocational counselor, informed any of the employees of Broward County of her specific disability.  Instead, she relies upon the information furnished, that she could not read and had taken special education courses, as sufficient to put Broward County on notice of her developmental disorder.  While illiteracy is a serious problem, it does not always follow that someone who is illiterate is necessarily suffering from a physical or mental impairment.  *Jones v. Bowen*, 660 F. Supp. 1115, 1121 (C.D. Ill.1987).  <u>Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA</u>.

Other courts have rejected the contention that a plaintiff can sustain a *prima facie* case of handicap discrimination without proof that an employer had actual or constructive knowledge of an applicant's disability. *See Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928 (7th Cir. 1995). Hedberg worked for Indiana Bell Telephone Company for over thirty years, serving as a distributor manager for approximately seven years.  He was chosen for discharge, along with others, during a period of restructuring.  Prior to being told of his termination, however, Hedberg was informed by the company's physician that he suffered from primary amyloidosis, an often fatal illness.

After appealing his discharge, Hedberg sued the phone company, claiming that the company fired him because he had primary amyloidosis, which both parties agreed constituted a "disability" as the ADA defines the term.  <u>In granting the phone company's motion for</u>

summary judgment, the district court found that "Hedberg [could not] succeed on his ADA claim if the decision to terminate [him] was reached without knowledge that [he] had a disability." On appeal, the Seventh Circuit affirmed, touching on the relevant issue in this case:

> [A]n employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability. . . .   At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee " *because of* " a disability unless it knows of the disability.   If it does not know of the disability, the employer is firing the employee "*because of*" some other reason.   (emphasis added).

*Id.* at 932.   *See O'Keefe v. Niagara Mohawk Power Corp.*, 714 F. Supp. 622 (N.D.N.Y. 1989) (employer did not violate New York law when it discharged plaintiff prior to becoming aware of his alcohol problem); *Landefeld v. Marion General Hospital*, 994 F.2d 1178 (6th Cir.1993) (Internist could not prove hospital suspended him because of his mental illness absent evidence that it knew of that illness).   There is no evidence in this case that the defendant knew that the plaintiff's inability to read was a result of an organic dysfunction rather than a lack of education.

*Morisky*, 80 F.3d at 447-450 (emphasis by underlining added).   Accordingly, under *Morisky*, it is incumbent upon Boyd to show sufficient evidence of HMA's knowledge of her impaired status (as opposed to merely an awareness of her medical conditions and treatment) to support her failure-to-promote disability claim.

The HMA employees that Boyd primarily relies upon to support her disability claim are Henson and Steelman.   The record evidence shows that, while Boyd maintains that Henson and Steelman perceived her as disabled, she cannot recall

anything Steelman said or did leading her to such a conclusion.  AF No. 50.  Further, although Steelman remembers Henson's making comments on the way Butler walked and on her attendance, AF No. 51, neither Henson nor Steelman were ever made aware that Boyd had any medical condition that potentially substantially limited a major life activity.  AF No. 52.

Concerning the selection process more particularly, Steelman played no role. AF No. 53.  Henson provided Boyd with a 2.13 Team Manager assessment score, which was lower than Williams, but did allow her to interview for the ATS position. AF No. 53.  No associate on the interview team was aware that Boyd was disabled. AF No. 54.  Further, at no time has HMA received any information that Boyd's ulcerative colitis and/or bursitis rendered her disabled.  AF No. 55.

Similar to *Morisky*, these facts do not establish the requisite level of knowledge of a disability or a substantially limiting condition on the part of HMA, and Boyd offers no contrary evidence.  Comments by Henson and Steelman about Boyd's time away from work, without more, do not establish HMA's awareness that Boyd was significantly limited in her functioning, especially when Steelman played no part in the promotion selection process, Henson's scoring allowed Boyd to advance in the process, and although some were aware of her conditions and treatment generally, no associate involved as part of the interview team had knowledge that Boyd was

disabled. Under such circumstances, Boyd cannot succeed on her ADA claim because "'the decision [not to promote] [her] was reached without knowledge that [she] had a disability.'" *Morisky*, 80 F.3d at 448 (citation omitted). Accordingly, summary judgment in favor of HMA, is alternatively appropriate even assuming that Boyd is disabled under the ADA due to her ulcerative colitis and/or bursitis because she is unable to show sufficient evidence of HMA's knowledge of her disabled status.

Similarly, Boyd has not substantiated her perceived-as-disabled claim. In particular, the same factual basis is lacking to show that anyone at HMA, whether involved in the promotional decision-making process or outside of it, regarded Boyd as disabled and/or substantially limited in a major life activity. *See Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 913 (11th Cir. 1996) ("In reviewing the evidence in the record in the light most favorable to Gordon, we conclude that such evidence is insufficient to support a finding that Hamm regarded Gordon as having a physical or mental impairment that substantially limited his ability to care for himself or to work.").[10]

_____

[10] The court notes that Boyd's regarded-as-disabled claim appears to be a much closer question when viewed under the ADAAA. In particular, one of the stated purposes of the ADAAA is "(3) to reject the Supreme Court's reasoning in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the

Therefore, HMA is entitled to summary judgment as to Count Three.

### b.    Failure to Accommodate

Boyd also complains that HMA failed to accommodate her by providing her with a base radio station to perform her job.  Regarding an employer's alleged failure to reasonably accommodate, the Eleventh Circuit has explained that:

> Under the ADA, an employer may not discriminate against "'a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Hilburn*, 181 F.3d at 1226 (quoting 42 U.S.C. § 12112(a)). The burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims. *See id.*  To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability.  *See LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998).

> The parties do not dispute that Appellant has a disability for purposes of the ADA. Rather, the issue is whether Appellant is "qualified" under the ADA. An individual is "qualified" if she, with or without reasonable accommodation, can perform the essential functions and job requirements of the position the individual holds. *See* 42 U.S.C.

_____

Rehabilitation Act of 1973[.]"  Pub. L. 110-325, § 2(b)(3), Sept. 25, 2008, 122 Stat. 3553.  As the Supreme Court explained in *Arline*, "[b]y amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment."  480 U.S. at 284 (emphasis added).

§ 12111(8); *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S. Ct. 2361, 2367, 60 L. Ed. 2d 980 (1979). An employer must provide reasonable accommodations for employees with known disabilities unless such accommodations would result in undue hardship to the employer. *See Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996). <u>An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job.</u> *See LaChance*, 146 F.3d at 835 (citing 29 C.F.R. § 1630.2( o)(2)(ii) (1995)).

"Essential functions" are the fundamental job duties of a position that an individual with a disability is actually required to perform. See 29 C.F.R. § 1630.2(n)(2)(1). In determining what functions are deemed essential, the ADA states "consideration shall be given to the employer's judgment . . . and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). A job function also may be essential if there are a limited number of employees among whom performance of the job can be distributed. *See* 29 C.F.R. § 1630.2(n)(2)(ii); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997).

*Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (emphasis added).

Here, Boyd's failure-to-accommodate claim does not survive summary judgment for at least three reasons. First, as explained above, Boyd has not demonstrated that she suffers from a disability under the ADA. As a result, the court does not even have to reach any analysis regarding the need of HMA to accommodate her under the ADA. *See Gordon*, 100 F.3d at 909 ("The accommodations that Gordon needed as a result of his cancer included leaving work a couple of hours early every Friday for blood testing and chemotherapy."); *Gordon*, 100 F.3d at 915 ("We

hold that Gordon did not have a disability under the ADA.  Accordingly, he is not entitled to the Act's protections."); *cf. Earl*, 207 F.3d at 1365 ("The parties do not dispute that Appellant has a disability for purposes of the ADA.").

Second, assuming *arguendo* that Boyd is disabled, Boyd's failure-to-accommodate claim is still lacking due to her inability to prove that she was suffering from any "known disabilities[.]"   "An employer must provide reasonable accommodations for employees with known disabilities unless such accommodations would result in undue hardship to the employer."  *See Earl*, 207 F.3d at 1365 (citing *Morisky*, 80 F.3d at 447).

Third, Boyd has not shown how the provision of a base station radio is necessary for her to perform the essential functions of her position.  Instead, she has admitted that she is fully able to perform those functions even without a base station radio.  AF No. 44 ("Boyd is able to work her full shift at HMA and perform all of the essential functions of her job."); AF No. 58 ("Boyd asserts that she requested and did not receive a base station radio for her work area that would make it easier for her and other associates to contact their Team Coordinator ("TC") when they need to use the bathroom, but concedes that she is currently able to contact her TC and that she has never been prohibited from using the bathroom.") (emphasis added).  Under such circumstances, Boyd cannot meet her "burden of identifying an accommodation that

would allow a qualified employee to perform the essential functions of her job"
because she is already capable of performing those essential functions without any
accommodation. *Earl*, 207 F.3d at 1367 (citing *Stewart v. Happy Herman's Cheshire
Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)).

### 4.      Retaliation Under § 1981, Title VII, and the ADA

In responding to HMA's Motion for Summary Judgment, Boyd offers no
admissible evidence or argument to substantiate her claim of retaliation under § 1981,
Title VII, or the ADA.  Under such circumstances, Boyd has abandoned any claim of
retaliation against HMA.  *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322
(11th Cir. 2001) (finding claim abandoned when argument not presented in initial
response to motion for summary judgment); *Bute v. Schuller International, Inc.,* 998
F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see
also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d
1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is
sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar
Corp.,* 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.,* 209
F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); *cf. McMaster v. United States,* 177 F.3d
936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court
is presented with no argument concerning a claim included in the plaintiff's

complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

Relatedly, the court is under no independent obligation to develop grounds in opposition to summary judgment on behalf of Boyd as "the onus is upon the parties to formulate arguments[.]" *Dunmar*, 43 F.3d at 599 (citation omitted); *see also Dunmar*, 43 F.3d at 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.") (citation omitted)). Accordingly, for these reasons, summary judgment in favor of HMA as to Count Four is appropriate.

### 5.    Title VII Hostile Work Environment

Boyd has similarly abandoned any Title VII hostile work environment claim in opposing HMA's Motion for Summary Judgment. Therefore, summary judgment in favor of HMA is due to be entered on Count Five of Boyd's complaint under the same rationale explained by the court in § IV.B.4.

## V.    CONCLUSION

Accordingly, for the reasons stated above, HMA's Motion for Summary Judgment (Doc. 26) is due to be granted, its Motion to Strike Opposition (Doc. 39)

is due to be granted in part and denied in part, and its Motion to Strike Response (Doc. 40) is due to be granted in part and denied in part.  A separate order will be entered.

**DONE** and **ORDERED** this the 29th day of June, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge